IN THE ST. CHARLES COUNTY CIRCUIT COURT
STATE OF MISSOURI

| | |
|---|---|
| Kattie Dedloff, <br><br> Plaintiff, <br><br> - against - <br><br> Whole Foods Market Group, Inc., <br><br> Defendant | Jury Trial Demanded <br><br> SERVE DEFENDANT AT: <br> 525 N. Lamar Blvd., Austin TX 78703 |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Whole Foods Market Group, Inc. ("Defendant") manufactures, labels, markets, and sells boxes of Long Grain & Wild Rice – Rice Pilaf, under its 365 brand ("Products").

I. CONSUMERS VALUE BIGGER PACKAGING

2. Consumers purchasing everyday items such as low-cost groceries are likely to exhibit a low degree of care.

3. The average consumer spends 13 seconds making an in-store purchasing decision.

4. Faced with a large and a smaller box, consumers choose the larger box, thinking it is a better value.

5. Studies show approximately 80 percent of consumers do not look at label information, especially the net weight and servings.

6. Though a reasonable consumer does not expect a package to burst at the seams, they expect the amount of product bears a reasonable relationship to the size of the package.

II. WHOLE FOODS' COMMITMENT TO SUSTAINABLE PRACTICES

7. Defendant's digital, print, television, and in-store marketing touts its commitment to

sustainability and environmental stewardship, formally embodied in corporate policies.[1]

Home / Mission In Action / Environmental Stewardship

## Environmental Stewardship

We're always looking for ways to do more for our planet — because we believe it's worth it for our customers, team members and suppliers. Whether it's diverting food waste from landfills or making our stores more energy efficient, learn how we're promoting environmental stewardship to make our earth happier for the future.

8. Defendant tells customers, "We Care About Our Communities and the Environment experience."

9. Defendant recognizes the global devastation caused to the planet by excess waste, affirming, "We balance our needs with the needs of the rest of the planet so that the Earth will continue to flourish for generations to come," and "We are committed to reduced packaging, composting and water and energy conservation."

10. Like many global environmental groups, Defendant recognizes the grave threat to the planet and ecosystems caused by the proliferation of plastic waste.

11. Defendant promotes its "Commitment to Reducing Single-Use Plastics."

---

[1] Whole Foods, Environmental Stewardship.

Home / Mission In Action / Environmental Stewardship / Our Commitment To Reducing Single-Use Plastics

# Our Commitment to Reducing Single-Use Plastics

Learn about our achievements and ongoing programs that work to reduce plastic across store departments and nourish our planet.

12. In 2007, Defendant was the first food retailer to introduce 100% post-consumer recycled-content paper bags, certified by the Forest Stewardship Council.

13. The next year, Defendant banned plastic grocery bags at checkout.

14. Defendant offers a wide selection of reusable bags at nominal prices.

15. In 2019, in response to the accelerating environmental harm from excess packaging materials, Defendant introduced smaller pull bags for all fresh produce.



**Smaller Produce Bags**

In 2019, we introduced smaller produce pull bags for our fresh fruits, vegetables and herbs. Our packaging manufacturer estimates that this change saves 213,408 pounds (or 106.7 tons) of plastic annually.



**Reusable Grocery Bags**

We also offer a wide selection of reusable grocery bags in a variety of colors and sizes at affordable prices. Just pick one up at the checkout in your store.

16. Each year, this saves 213,408 pounds (or 106.7 tons) of plastic.

17. Defendant's commitment to sustainable packaging is also evident through its elimination of Styrofoam (polystyrene), used for meat packaging trays and in other areas.

18. In 2019, Defendant's prepared foods department was the first in the nation to replace

all hard plastic rotisserie chicken containers with reduced plastic bags.

19. These bags use 70% less plastic, saving nearly 1.7 million pounds of plastic annually.



**Styrofoam-Free Packaging**

We've eliminated all Styrofoam (polystyrene) meat packaging trays in all our stores in the U.S. and Canada. We've also removed all Styrofoam from our food service packaging.



**Reduced Plastic Rotisserie Chicken Bags**

As of October 2019, we replaced all hard plastic rotisserie chicken containers with bags that use approximately 70% less plastic, which our packaging manufacturer estimates saves nearly 1.7 million pounds of plastic annually.

### III. EMPTY SPACE IN DEFENDANT'S LONG GRAIN & WILD RICE BOXES

20. The Product is sold in a box measuring, in inches, 6.75 (height) by 4.25 (length) and 1.5 (width).



21. Judging from the size of the box, reasonable consumers expect it to be substantially filled with rice and contain the packet of seasoning.

22. However, over 50% of the box is empty space, because the rice and seasoning packages correspond to 3.25 inches on the tape measure.



23. Consumers are misled into believing that they are purchasing substantially more rice than they receive.

## IV. NO LEGITIMATE REASONS FOR EMPTY SPACE

24. Federal and identical state regulations recognize that deceptive packaging can be used to the detriment of consumers, but also that there are valid reasons ("safe harbors") for why

foods may have what appears to be excess space, or slack-fill. *See* 21 C.F.R. § 100.100 ("Misleading containers.").

25. For slack-fill to be deemed nonfunctional, the empty space cannot be due to one of the six recognized safe harbors. 21 C.F.R. § 100.100(a)(1)-(6) ("Safe Harbors").

26. The slack-fill in the Product is nonfunctional because it is not covered under any of these safe harbors.

27. First, the rice and flavor packets do not require more than 50% empty space to protect them from damage, as they are not at risk of breakage. *See* 21 C.F.R. § 100.100(a)(1) ("Protection of the contents of the package").

28. This is in contrast to potato chips, which contain a significant amount of air, to prevent the contents from being crushed and the chips destroyed.

29. In fact, rice would be better protected in a smaller box, because all of the excess air at the top allows other items to press against this portion of the box, possibly causing it to "pop" or be damaged.

30. Second, there are no requirements of the machines used to enclose the contents that would leave over 50% of empty space. *See* 21 C.F.R. § 100.100(a)(2) ("The requirements of the machines used for enclosing the contents in such package").

31. There is no reason the machines used for enclosing rice grains in the plastic packaging cannot use less plastic and contain the same amount of rice.

32. There is no reason the machines used for enclosing the rice's plastic packaging cannot form a box in dimensions other than 6.75 (height) by 4.25 (length) and 1.5 (width) (inches).

33. The machines used to form the box can be adjusted if the rice packaging was reduced.

34. Defendant sells similar rice products with seasoning, in similar or identical sizes, that

Electronically Filed - St Charles Circuit Div - November 04, 2022 - 02:25 PM

contain significantly less slack-fill.

35. For example, one of these products rice produce contains approximately 20% slack fill, as opposed to over 50% of slack fill contained in the Product.

36. Third, no issue exists with respect to the rice and flavor packets settling during shipping and handling. *See* 21 C.F.R. § 100.100(3) ("Unavoidable product settling during shipping and handling")

37. The rice grains and seasoning are dense, and no settling occurs after they are deposited into their separate plastic packaging, which is placed in the box.

38. No additional product settling occurs during subsequent shipping and handling.

39. Additionally, Defendant's other similarly sized rice products do not contain over 50% of empty space.

40. Fourth, the packaging is not required to perform a specific function, i.e., play a role in the preparation or consumption of the rice pilaf. *See* 21 C.F.R. § 100.100(4).

41. The packaging is there to hold the rice and flavor packet and not needed to consume the Product.

42. Once a customer pours the rice into a bowl for cooking, the packaging's role is finished.

43. Fifth, the box is not a "reusable container," nor part of the presentation of the rice and seasoning and does not have value in proportion to the value of the product, independent of its function to hold the food. *See* 21 C.F.R. § 100.100(5).

44. This is confirmed because the box and plastic packaging are discarded after, and are not intended to be filled with other items.

45. The box and plastic packaging do not contain any re-sealable tops or special coatings

Electronically Filed - St Charles Circuit Div - November 04, 2022 - 02:25 PM

which would facilitate their further use.

46. Sixth, no inability exists to increase the amount of rice or to reduce the size of the plastic and outer packaging to a minimum size necessary to accommodate required food labeling or perform another purpose. *See* 21 C.F.R. § 100.100(6).

47. It is easier to use smaller plastic and cardboard packaging, because this will still provide space for the contents, and save money on packaging materials.

48. This is confirmed by Defendant's similar products which contain significantly less empty space.

49. There is no need for a tamper resistant device, and the Product is sold without one.

50. The presence of a tamper resistant device is not a barrier to reducing the size of the rice's plastic packaging and the cardboard box.

51. Defendant can reduce deception by adding a prominent fill line or transparent window to the front label.

52. Because the package does not allow consumers to view its contents, and contains nonfunctional slack-fill, the packaging is misleading to consumers.

## V. DEFENDANT MATCHES PRODUCT SIZE TO SHELF HEIGHTS

53. Studies confirm that a common practice of retailers, including Defendant, is to match the height of product packaging to shelf heights.

54. This makes the shelves look full, which appeals to consumers and makes them willing to spend more money.

55. This shows a deliberate attempt, and knowledge, to mislead consumers.

## VI. EXCESS PACKAGING VIOLATES DEFENDANT'S ENVIRONMENTAL COMMITMENTS TO CONSUMERS

56. Defendant promised customers, through digital, print, audio, television, and in-store

Electronically Filed - St Charles Circuit Div - November 04, 2022 - 02:25 PM

placards and signs, that it is replicating its reduction in excess packing materials across all aspects of its operations, to promote environmental welfare.

57. Defendant recognizes that non-functional slack-fill aggravates the climate, waste and plastic pollution crisis at all stages, from resource extraction, production, distribution, transport in collection systems, landfilling, incineration and recycling.

58. The effects are twofold, because excess packing materials are made from raw materials that would not otherwise have been used, and once the item is used and consumed, the excess materials are discarded.

59. Often, disadvantaged communities, either in this country, or abroad, are the locations where plastic and other waste materials are transported, where open burning of waste materials is commonplace.

60. This causes emission of carbon dioxide and other toxic compounds into the atmosphere and fragile ecosystems.

61. Defendant's excess packaging violates its pledges and commitments to consumers that it will operate sustainably and promote environmental stewardship.

62. Defendant intentionally packages the Product in opaque cardboard containers that are constructed in such a way that does not allow for a visual or audial confirmation of the contents of the Product.

## VII. CONCLUSION

63. The Product contains other representations which are misleading.

64. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

65. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

66. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

67. As a result of the false and misleading representations, the Product is sold at a premium price, approximately $2.99 per 6 oz (170g), excluding tax and sales, higher than similar products represented in a non-misleading way, and higher than it would be sold for absent the excessively large and underfilled box/plastic packaging.

## Jurisdiction and Venue

68. Plaintiff Kattie Dedloff is a citizen of Missouri.

69. Defendant Whole Foods Market Group, Inc. is a Delaware corporation with a principal place of business in Austin, Texas, Travis County.

70. Defendant transacts business within this District through sale of the Product directly to residents from its website and that of its corporate parent, Amazon.com, and its numerous stores in this District.

71. Venue is appropriate in this Court because a substantial part of the events or omissions giving rise to the claims occurred here, including Plaintiff's purchase, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

## Parties

72. Plaintiff Kattie Dedloff is a citizen of St. Charles County, Missouri.

73. Defendant Whole Foods Market Group, Inc. is a Delaware corporation with a principal place of business in Austin, Travis County, Texas: 525 N. Lamar Blvd., Austin TX 78703.

74. Whole Foods operates over five hundred stores in the United States.

75. The Product is available at all of Defendant's stores.

76. Defendant has final responsibility and authority for the labeling, packaging, and production of all items bearing the 365 brand, shown below.

> DISTRIBUTED BY:
> WHOLE FOODS MARKET
> AUSTIN, TX 78703
> ©2018 WHOLE FOODS MARKET IP, LP
> www.wholefoodsmarket.com

77. Whole Foods is self-described as "more than just a grocery store," because it maintains the "strictest quality standards."

78. These standards include a commitment to the food it provides and ensuring it provides these foods in a way which does not negatively impact the environment.

79. Whole Foods promises customers that it carefully vets its products to make sure they only sell the "highest quality natural and organic foods," by researching ingredients, auditing sourcing practices, and maximizing its commitment to sustainability and environmental stewardship, which entails elimination of excess packaging material which contributes to the global plastic and climate crises.

80. These facts show a company with a significant amount of goodwill, trust and equity when it comes to consumer purchasing.

81. While Whole Foods stores sell leading national brands, they sell a large number of products under one of their private label brands, 365.

Case: 4:22-cv-01340-AGF    Doc. #: 6    Filed: 12/15/22    Page: 12 of 20 PageID #: 64

Electronically Filed - St Charles Circuit Div - November 04, 2022 - 02:25 PM

82. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

83. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

84. Products under the 365 brand have an industry-wide reputation for quality and value.

85. In releasing products under the 365 brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

86. Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

87. That 365 branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

88. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

89. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

90. Private label products under the 365 brand benefit by their association with consumers' appreciation for the Whole Foods brand as a whole.

91. The development of private label items is a growth area for Whole Foods, as they select only top suppliers to develop and produce 365 products.

92. Plaintiffs were aware of this commitment to customer satisfaction when they bought the Product, because they knew if anything went wrong, Defendant would "make it right."

93. These facts show a company with a significant amount of goodwill and equity when

it comes to consumer purchasing.

94. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Whole Foods, 1601 S. Brentwood Blvd., St. Louis, Missouri 63144, among other times.

95. Plaintiff could not and did not reasonably understand or expect any of the net weight or serving disclosures to translate to an amount of rice meaningfully different from his expectation of an amount which would fill up the box.

96. Only when Plaintiff opened the box did she discover, to her disappointment, that it was less than half-full.

97. Plaintiff bought the Product because she expected it contained an amount of rice that had a reasonable relationship to the packaging in which it was presented because that is what the representations said and implied.

98. Plaintiff relied on the words and images on the Product, on the labeling, statements, and/or claims made by Defendant in digital, print and/or social media, which accompanied the Product and separately.

99. Plaintiff was aware of Defendant's environmental pledges and commitments, through its extensive marketing and advertising, in its stores and across various media.

100. Plaintiff was disappointed because the Product's excess packaging was inconsistent with Defendant's promises about sustainability and environmental stewardship, and its claim it would reduce the use of raw materials in packaging.

101. Plaintiff bought the Product at or exceeding the above-referenced price.

102. Plaintiff purchased the Product for her own, personal use.

103. Plaintiff would not have purchased the Product if she knew the representations and

omissions were false and misleading or would have paid less for it.

104. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

105. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

106. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities and/or composition.

107. Plaintiff is unable to rely on the labeling and representations about the issues described here for not only this Product, but other similar products, because she is unsure of whether those representations are truthful.

## Class Allegations

108. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Missouri Class:** All persons in the State of Missouri who purchased the Product during the statutes of limitations for each cause of action alleged; and a
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Missouri, Illinois, Maryland, Hawaii, New York, Washington D.C., Rhode Island, Vermont, Washington, Connecticut, who purchased the Product during the statutes of limitations for each cause of action alleged.

109. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

110. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

111. Plaintiff is adequate representative because his interests do not conflict with other

members.

112. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

113. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

114. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

115. Plaintiff seeks class-wide injunctive relief because the practices continue.

Missouri Merchandising Practices Act ("MMPA"),
Mo. Rev. Stat. § 407.010, et seq.

116. Plaintiff incorporates by reference all preceding paragraphs.

117. Plaintiff purchased the Product for his own, personal use.

118. Plaintiff and all members of the proposed class are "persons" and the Products are "merchandise" as those terms are defined under the MMPA.

119. Defendant designed the box so consumers like Plaintiff would expect that it contained more rice pilaf than it did.

120. The container misleads consumers because it is only 48% filled with rice pilaf, having nearly 52% empty space, other than a thin flavoring packet and plastic packaging.

121. Plaintiff relied on the size of the box to expect it would contain more rice pilaf than it did.

122. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Violation of State Consumer Fraud Acts
### (Consumer Fraud Multi-State Class)

123. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

124. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

125. The members of the Consumer Fraud Multi-State Class were misled similarly to Plaintiff with respect to their expectations the Product would contain more rice pilaf than it did

### Breaches of Express Warranty,
### Implied Warranty of Merchantability/Fitness for a Particular Purpose and
### Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

126. The Product was manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it contained an amount of rice that had a reasonable relationship to the packaging in which it was presented.

127. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, distributed product descriptions, and targeted digital advertising.

128. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

129. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product contained an amount of rice that had a reasonable relationship to the packaging in which it was presented.

Electronically Filed - St Charles Circuit Div - November 04, 2022 - 02:25 PM

130. Defendant's representations affirmed and promised that the Product contained an amount of rice that had a reasonable relationship to the packaging in which it was presented.

131. Defendant described the Product as one which contained an amount of rice that had a reasonable relationship to the packaging in which it was presented, which became part of the basis of the bargain that the Product would conform to its affirmation and promise.

132. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

133. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high-quality products, transparent labeling, and a commitment to putting customers first.

134. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

135. Plaintiff has provided written notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's express and implied warranties, specifically sending, on or before October 25, 2022, a Notice Letter to Defendant at its business address, set forth *supra*.

136. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, industry bodies, competitors, and consumers, to its main offices, and by consumers through online forums.

137. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

138. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was

marketed as if it contained an amount of rice that had a reasonable relationship to the packaging in which it was presented.

139. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it contained an amount of rice that had a reasonable relationship to the packaging in which it was presented, and he relied on Defendant's skill or judgment to select or furnish such a suitable product.

### Negligent Misrepresentation

140. Defendant had a duty to truthfully represent the Product, which it breached.

141. This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company known for its high-quality products.

142. Defendant's representations regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency, and putting customers first, that it has been known for.

143. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

144. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

145. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, his purchase of the Product.

### Fraud

146. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained an amount of rice that had a reasonable relationship to the packaging in which it

was presented.

147. The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and/or constructive knowledge of the falsity of the representations.

## Unjust Enrichment

148. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary damages, including statutory and/or punitive damages and interest pursuant to statutory and common law claims;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Daniel F. Harvath
Harvath Law Group, LLC
75 W Lockwood Ave Ste 1
Webster Groves MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com

Sheehan & Associates, P.C.
Spencer Sheehan (*Pro Hac Vice* forthcoming)
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

Electronically Filed - St Charles Circuit Div - November 04, 2022 - 02:25 PM